```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

WET SANDS, INC., et al.           *

          Plaintiffs              *

             vs.                  *   CIVIL ACTION NO. MJG-06-2243

PRINCE GEORGE'S COUNTY, MARYLAND  *

          Defendant               *

*      *      *      *      *      *      *      *      *

INTERNATIONAL NITE LIFE           *
  ENTERPRISES, INC.
                                  *
             vs.                      CIVIL ACTION NO. MJG-06-2581
                                  *
JACK JOHNSON, et al.
                                  *
          Defendants
*      *      *      *      *      *      *      *      *
```

## MEMORANDUM OF DECISION

These cases, consolidated for trial, were tried to the Court without a jury.  The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.  The facts set forth herein are found based upon the Court's evaluation of the evidence and the reasonable inferences derived therefrom.


I.    BACKGROUND

    A.    Parties

    Plaintiffs Wet Sands, Inc. ("Wet Sands"), CD15CL2001, Inc. ("CD"), Nico Enterprises, Inc. ("Nico"), and International Nite Life Enterprises, Inc. ("Nite Life") are Maryland Corporations that, at all times relevant hereto, have provided nude or semi-

nude dancing in Prince George's County, Maryland.[1]   The sole
Defendant at trial[2] was Prince George's County, Maryland
(hereinafter "the County").

The adult entertainment provided by Plaintiffs herein
includes entertainers[3] performing dances on a stage while nude or
scantily attired.   There is physical contact or proximity between
customers and entertainers during the stage dancing if customers
approach - or touch - the dancers while giving tips.   Plaintiffs
also permit customers to have female entertainers perform "lap
dances" in which a female entertainer moves on a male customer's
lap.   Plaintiffs extensively monitor physical contact between
patrons and entertainers to prevent overt sexual activity and
other intimacies.

Plaintiffs (and others in the same business) typically
generate revenue by charging admission,[4] selling beverages
(including alcoholic beverages if licensed to do so), selling of
some edibles[5] and charging fees for lap dances.   The entertainers

---

[1]   "John Doe" and "Jane Doe" plaintiffs, identified as
representative patrons of the corporate Plaintiffs'
establishments by Wet Sands, CD and Nico, have not participated
actively in the proceeding and are assumed to lack standing
herein.

[2]   Nite Life sued Defendant Jack Johnson, but stipulated to
the dismissal of all claims against him.   [Paper 19]

[3]   Most of the businesses provide female dancers; Wet Sands
provides male, not female, dancers.

[4]   The admission charge is sometimes euphemistically
expressed as a membership fee or the like.

[5]   Typically, chips, pretzels and the equivalent.

are typically not paid by the business.  Indeed, the entertainers normally pay the business a fee for the privilege of entertaining and earning tips that, it appears, can amount to considerable sums in the course of an evening.

      B.   <u>The Legislation</u>

On July 18, 2006, the County Council of Prince George's County ("the Council") enacted CB-31-2006 ("CB-31"), a zoning regulation that granted the Prince George's County Police and Fire Chiefs the power to require operators to cease and desist the operation of activities that are dangerous to the public health or safety, or being conducted without a premises license.

On the same date, the Council enacted CB-61-2006 ("CB-61"), an ordinance that established conduct restrictions and licensing requirements for "adult entertainment" businesses.

As discussed more fully herein, CB-61 places certain conduct restrictions on adult entertainment premises, providing, <u>inter alia</u>, that any nude dancer must perform on a stage raised at least eighteen inches off of the ground six feet away from all patrons.  Contact between certain specified anatomical areas of performers and patrons is prohibited, as is providing a gratuity while performances are ongoing.  CB-61 also requires an adult entertainment business to obtain a license and meet specified safety standards.  The ordinance further requires the licensing of managers and entertainers working in the business.

C.   <u>Procedural Background</u>

Wet Sands, CD, and Nico filed suit against the County on August 29, 2006.  They contend that CB-31 and CB-61 violate the United States Constitution's First Amendment, the Takings and Due Process Clauses of the Fifth Amendment, and the Equal Protection Clause of the Fourteenth Amendment as well as the Maryland Declaration of Rights.  They further claim that the aforesaid provisions are unconstitutionally vague and overbroad.  They requested a declaratory judgment, as well as preliminary and permanent injunctive relief against the enforcement of CB-31 and CB-61.  On September 15, 2006, Judge Chasanow,[6] deferred ruling on a request for a broad restraint against the legislation, but preliminarily enjoined enforcement of the provision in CB-61 requiring the public posting of licenses required thereunder. Hr'g. Tr.[7] 102, 104-05.

Nite Life filed suit on October 5, 2006 presenting essentially the same contentions with regard to CB-61.[8]

On October 5, 2006, these cases were transferred to the undersigned Judge.  On October 18, 2006, this Court issued a Preliminary Injunction providing that, by agreement of the parties, Prince George's County would not take action to enforce CB-61 until the conclusion of the trial.

---

[6]   To whom the case was then assigned.

[7]   References to "Hr'g Tr." are to the transcript of the September 15, 2006 hearing before Judge Chasanow.

[8]   Nite Life does not present any claim with regard to CB-31.

The cases were tried in a consolidated proceeding on November 20 and 21, 2006.  Thereafter, a hearing was held and counsel presented post-trial arguments.


II.  <u>DISCUSSION</u>

A.  <u>CB-31 (Zoning)</u>

Wet Sands, CD, and Nico present an "as-applied facial challenge" to CB-31, contending that, although CB-31 is a generally applicable health and safety law that is neutral on its face, it is unconstitutional "as applied to First Amendment forms of businesses."  Pl.'s Pretrial Mem. [Paper 30] at 8.  The essence of the argument is that CB-31 affords Prince George's County officials "unbridled discretion" that they <u>could</u> use unconstitutionally to censor speech (including expressive conduct) of which they disapprove.

On its face, CB-31 does not differentiate between adult entertainment establishments and other businesses.  The law allows the Chiefs of the Police and Fire Departments to force the closure of any type of business or activity if a use and occupancy permit is lacking, or if the activity presents an immediate danger to public health or safety.  CB-31, §§ 27-260, 27-264.01.  Should a business be closed by virtue of this authority, a Zoning Hearing Examiner must hold a hearing within four days on the validity of the closing, and must render a decision two days after the hearing.  <u>Id.</u> §§ 27-264.01 (d), (g).

5

Decisions of the Zoning Hearing Examiner may be appealed to the Circuit Court for Prince George's County.  Id. § 27-264.01(i).

Wet Sands, CD, and Nico rely primarily on Lady J Lingerie v. City of Jacksonville, 176 F.3d 1358 (11th Cir. 1999), wherein the city of Jacksonville enacted zoning laws that allowed adult entertainment establishments to operate as of right in just one area of the city.  Id. at 1361.  Moreover, the legislation further required that an adult entertainment establishment be located a specified distance from other such businesses.  As a practical matter, only two limited areas remained available for adult entertainment businesses within the permissible zone.  Id. Adult entertainment businesses could apply for a zoning exception that would permit them to operate in a second zone of the city. Id.  However, the approval of applications for this exception was subject to the discretion of the zoning board, guided only by nebulous standards such as "compatibility" or "environmental considerations."  Id. at 1362.

The Eleventh Circuit held that this "unbridled discretion" did not pass constitutional muster because the zoning board's decision was not subject to "precise and objective" criteria. Id.  Due to the danger that this broad discretion could be use to stifle certain forms of expression, the court held that the subjective zoning exception criteria could not be used with regard to applicants whose businesses are entitled to First Amendment protection.  Id.

6

The decision in <u>Lady J Lingerie</u> concerned legislation that, unlike CB-31, subjected adult entertainment businesses to standards different from those applicable to other businesses. These businesses were relegated to accepting a location in a part of a small zone in Jacksonville or being subject to the vagaries of a zoning board exception application process.  In sharp contrast, CB-31 makes no distinction between types of businesses. It does not disadvantage businesses - such as Plaintiffs' - that would be subject to First Amendment Protection.

Furthermore, CB-31 allows closure of any business only if that business has violated certain county safety codes or failed to obtain a use and occupancy permit.  The closure can then be appealed to the Zoning Hearing Examiner and heard within four days; a decision must follow two days later.  A dissatisfied party may appeal the decision of the Zoning Hearing Examiner to the Circuit Court for Prince George's County.  Thus, there is rapid administrative review and prompt access to the courts for any business closed pursuant to CB-31.

Of course, as Judge Chasanow noted in her ruling in regard to preliminary relief, should CB-31 be implemented in a manner that discriminates against adult entertainment establishments, Plaintiffs (or any other affected person) may present an "as-applied" challenge to CB-31.  Hr'g. Tr. 104.  However, the instant case does not present any such challenge.

In sum, CB-31 does not distinguish between types of businesses, provides for prompt administrative and judicial

review of any closure and, therefore, is not unconstitutional on its face as violative of Plaintiffs' First Amendment freedoms.

### B.   CB-61 (Conduct Restrictions and Licensing)

CB-61 includes conduct restrictions and a licensing scheme.

#### 1.   The Conduct Restrictions

##### a.   The Restrictions at Issue

CB-61 includes provisions prohibiting minors' access to the premises (§ 2613), preventing entertainers from being visible from any public place while employed on the premises (§ 2609(a)(8)), prohibiting operation of the adult entertainment business from 1 a.m. to 10 a.m. (§ 2612), and imposing certain restrictions on the conduct of the business (§ 2609(a)(1)-(7), (9)-(11).

Plaintiffs do not raise any objection to the prohibitions relating to access to minors or public visibility of entertainers. Nor do they raise any objection to several safety provisions in CB-61.[9]  Moreover, Plaintiffs concede that some restriction on the hours of operation would be acceptable, but argue that the hours restrictions on their clients must be reasonable.

Accordingly, the term "conduct restrictions" is utilized herein to refer to CB-61-2006 §§ 5-2609(a)(1)-(7) and (a)(9)-(11), but not §§ 5-2609(a)(8), 5-2609(b), 5-2612 and 5-2613.

---

[9]     See § 5-2609(b).

The conduct restrictions require that employees who are nude, semi-nude, or simulating any state of nudity be separated from the patrons.  To accomplish this result, the legislation provides:

> (1) No employee or entertainer shall be unclothed, clothed in less than opaque attire, or shall move or remove such attire, or allow such attire to be moved or removed so as to expose to view any portion of the breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals, except upon a stage at least eighteen inches (18") above the immediate floor level and removed at least six feet (6') from the nearest patron.

> \* \* \*

> (3) No employee or entertainer mingling with the patrons shall be unclothed or clothed in less than opaque and complete attire, costume or clothing as described in Section [5-2609](a) of this Section.

> \* \* \*

> (6) No employee or entertainer shall wear or use any device or covering exposed view which simulates the breast below the top of the areola, vulva or genitals, anus, buttocks, or any portion of the pubic region.

CB-61, §§ 5-2609(a)(1), (a)(3), (a)(6).  Accordingly, nudity[10] is not banned in adult entertainment establishments, so long as each nude entertainer is on a stage eighteen inches higher than the patron floor level and no patron is within six feet of a nude entertainer.

CB-61 provides further that:

---

[10]   The terms "nude," "nudity," etc. are used herein to refer to the state of "nudity" defined in CB-61.

9

(2) No employee or entertainer shall perform acts
of or acts which simulate:

  (A) Sexual intercourse, masturbation, sodomy,
bestiality, oral copulation, flagellation, or any
sexual acts which are prohibited by law;

  (B) The touching caressing or fondling of the
breasts, buttocks or genitals; or

  (C) The displaying of the pubic region, anus,
vulva or genitals; except as provided for in
Subsection (a) of this Section.

\*   \*   \*

(4) No employee or entertainer shall knowingly:

  (A) Touch, caress or fondle the breast,
buttocks, anus, genitals or pubic region of
another person; or

  (B) Permit the touching, caressing or fondling
of his or her own breasts, buttocks, anus
genitals or pubic region by another person; or

  (C) Permit any person upon the premises to
touch, caress, or fondle the breasts, buttocks,
anus, genitals or pubic region of another
person.

(5) No manager shall knowingly permit any person
upon the premises to touch, caress, or fondle the
breasts, buttocks, anus, genitals or pubic region
of another person.

\*   \*   \*

(7) No employee or entertainer shall use artificial
devices or inanimate objects to depict any of the
prohibited activities described in this section.

\*   \*   \*

(9) No entertainer shall solicit, demand or receive
any payment or gratuity from any patron for any act
prohibited by this chapter.

(10) No entertainer shall demand or collect any
payment or gratuity from any patron for
entertainment before its completion.

10

<u>Id.</u> §§ 5-2609(a)(4)-(5), (a)(7), (a)(9)-(11).

These provisions prohibit entertainers from touching themselves or others in certain parts of the body, from performing sexual acts and from engaging in, or simulating, sexual conduct.  Moreover, patrons are prohibited from tipping the entertainers during a performance.  Furthermore, the establishment must conspicuously display a sign stating the existence of certain of the conduct restrictions.

However, CB-61 contains a critical provision (the "Savings Clause") that limits the applicability of the foregoing conduct restrictions to obscene behavior.

b.   <u>The Savings Clause</u>

The Savings Clause of CB-61 provides:

(c) <u>This Division shall not be construed to prohibit</u> protected expression, such as:

(1) Plays, operas, musicals, or other dramatic works that are not obscene;

(2) Classes, seminars and lectures held for serious scientific or educational purposes that are not obscene; or

(3) <u>Exhibitions, performances, expressions or dances that are not obscene</u>.

(d) For purposes of this Division, an activity is "obscene" if:

(1) Taken as a whole by an average person applying contemporary community standards the activity appeals to a prurient interest in sex;

(2) The activity depicts patently offensive representations, as measured against the community standards, of:

11

> (A) Ultimate sexual acts, normal or perverted, actual or simulated; or
>
> (B) Masturbation, fellatio, cunnilingus, bestiality, excretory function, or lewd exhibition of the genital areas; or violent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape or torture; and
>
> (3) The activity taken as a whole lacks serious literary, artistic, political, or scientific value.

Id. § 5-2609 (emphasis added).

In view of the Savings Clause, the only restriction upon the expressive conduct aspect of Plaintiffs' business imposed by CB-61 is a prohibition against performances that are "obscene."  The Savings Clause defines "obscene" in accordance with the Supreme Court's definition in Miller v. California, 413 U.S. 15, 24 (1973).  Accordingly, except to the extent that such action may be found to constitute "obscenity" under Constitutionally acceptable standards, CB-61 does not restrict "nude" dancing or lap dancing, regardless of stage height, patron proximity or physical contact.

Of course, any conduct that constitutes "obscenity" under the Miller test can properly be prohibited under the legislation because there is no First Amendment protection for such conduct.

In sum, the Savings Clause performs its stated function; it saves the conduct restrictions of CB-61 from constitutional challenge.

c.   Equal Protection

12

Nite Life[11] contends that CB-61 denies it the equal protection of the law because it distinguishes between "for-profit" and "non-profit" businesses on its face.  Specifically, Nite Life points to the Public Indecency provision of CB-61 that prohibits persons from engaging in sexual intercourse or appearing in a state of nudity "in a public place or in a place open to the public."  CB-61, § 14-139.02.  CB-61 defines "place open to the public" as "any privately-owned place of business operated for a profit to which the public is invited."  § 1-102(25.1) (emphasis added).  Nite Life argues that CB-61 thus allows sexual intercourse or nudity in a place that is open to the public but not operated for a profit, creating an unconstitutional distinction between the two.  However, § 14-139.02 prohibits nudity and sexual intercourse not only in any "place open to the public," but also in any "public place."  The term "public place" is defined by CB-61 as including "any . . . place [whether or not operated for a profit] commonly open to the public."  § 1-102(25.1).  Therefore, the nudity prohibition in CB-61 does not distinguish between for-profit and non-profit operations; there is no Equal Protection clause violation.[12]

### d.  Vagueness

_____

[11]  The other Plaintiffs do not present this contention.

[12]  It may be true that a for-profit business is subject to the ban under two separate provisions while a not for profit operation is subject tot the ban by only one.  However, since both types of operations are subject to the very same treatment, there is no equal protection violation.

Statutory language is void for vagueness if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct" the statute prohibits, or if "it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000).

Plaintiffs argue that CB-61 is void because it is unconstitutionally vague.  Plaintiffs do not specify what parts of the ordinance they contend are impermissibly vague, but generally refer to the Middle District of North Carolina's holding in Giovani Carandola, Ltd. v. Fox that the terms "fondle" and "simulate" (both used in CB-61) were unconstitutionally vague.  396 F. Supp. 2d 630, 660 (M.D.N.C. 2005)(hereinafter "Carandola I"), rev'd in part, Carandola v. Fox, No. 05-2308, slip. op. (4th Cir. December 15, 2006) (hereinafter "Carandola II").

Like the North Carolina statute at issue in Carandola I, CB-61 prohibits an entertainer in an adult entertainment establishment from performing, inter alia, "acts which simulate" sexual intercourse, masturbation, and sodomy.  CB-61, § 5-2609(a)(2).  Additionally, entertainers cannot perform or simulate the "touching, caressing or fondling of the breasts, buttocks or genitals."  Id.; see id. §§ 5-2609(a)(4), (a)(5).

In Carandola II, the Fourth Circuit held that the verb "'simulate' is sufficiently precise to notify persons of ordinary intelligence of the conduct prohibited by the statute and to prevent the risk of arbitrary or discriminatory enforcement."

14

<u>Carandola II</u>, No. 05-2308, slip. op. at 8.  "An act only
constitutes simulated sexual intercourse or simulated
masturbation if it creates the realistic impression of an <u>actual</u>
act."  <u>Id.</u> at 9 (emphasis in original).  Moreover, the verb
"fondle" is "sufficiently clear to put persons of ordinary
intelligence on notice as to what conduct the statute prohibits
and to prevent the risk of arbitrary enforcement.  <u>Id.</u> at 9-10.
The Fourth Circuit noted that the term "fondling" occurred only
in conjunction with a "specified erogenous zone, indicating that
it aims to prevent overt sexual conduct."  <u>Id.</u> at 9.

In light of <u>Carandola II</u>, the Court must hold that CB-61 is
not void for vagueness.


e.   <u>Overbreadth</u>

Plaintiffs claim that CB-61 is unconstitutionally overbroad
because it "reaches a substantial number of impermissible
applications."  <u>New York v. Ferber</u>, 458 U.S. 747, 771 (1982).
However, when legislation limits conduct and not just speech,
"the overbreadth of a statute must not only be real, but
substantial as well, judged in relation to the statute's plainly
legitimate sweep."  <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615
(1973).  Should a statute suffer the overbreadth infirmity, any
enforcement is totally forbidden.  <u>Id.</u> at 613.  Therefore, the
Supreme Court has warned that the overbreadth doctrine is "strong
medicine" that should be used "sparingly and only as a last
resort."  <u>Id.</u>

15

Plaintiffs challenge the prohibition in CB-61 against the simulation of certain sexual acts.  CB-61, § 5-260(a).  However, in Carandola II the court held that essentially identical language was not overbroad because the prohibition on simulated sexual acts did not apply "when the performances that are presented are expressing matters of serious literary, artistic, scientific, or political value."  Carandola II, No. 05-2308, slip. op. at 6.  The Savings Clause in CB-61 has the same effect as the exception in the Carandola II legislation and saves CB-61 from being unconstitutionally vague.

### f.   Hours of Operation

Plaintiffs do not challenge the existence of a restriction on hours of operation in CB-61.  They contend, however, that any restriction on the hours of operation of their businesses must be reasonable and that it is fundamentally unfair to impose upon their providing of adult entertainment more stringent hours of operation than those imposed on businesses selling alcoholic beverages with (or without) other types of entertainment.

The ordinance requires that adult entertainment businesses operate only between the hours of 10:00 a.m. and 1:00 a.m.  CB-61, § 2612.  However, businesses that serve alcohol in Prince George's County may operate, with limited exceptions, between 6:00 a.m. and 2:00 a.m.  Thus, an adult entertainment business with a liquor license may continue to serve alcohol until 2 a.m. but at 1 a.m. must cease its adult entertainment.

16

The County has presented nothing whatsoever to support a conclusion that any secondary effects of adult entertainment - as distinct from other types of entertainment - require or even warrant an earlier closing time than business that provide alcoholic beverages.  On the other hand, the Court finds - as Plaintiffs conceded - that it is appropriate to impose reasonable restrictions on their hours of operation.  The Court finds that, on the record in the instant cases, the County's adoption of an hours of operation restriction on all places that serve alcohol without regard to the content or absence of entertainment provides an adequate basis for the adoption of the same restrictions on adult entertainment businesses.

Accordingly, the hours of operation restrictions in CB-61 are facially valid and enforceable, but only to the extent of the generally applicable restrictions imposed on businesses that are licensed to sell alcoholic beverages.

## g. Sign Posting

The sign posting provision of CB-61 shall be treated consistently with the decision regarding the substance of the items required to be stated thereon.  Accordingly, § 5-2609(a)(11) is held facially valid and enforceable only with regard to the requirement that there be a sign stating that the premises are licensed and that entertainers are not permitted to engage in any type of sexual conduct.

17

2.   <u>The Licensing Scheme</u>[13]

CB-61 provides that an individual who desires to operate or work in an "adult entertainment premises" as a manager or entertainer must obtain a license before doing so.  CB-61, §§ 5-2602 - 5-2603.

"Adult entertainment" is defined as:

> any exhibition, performance or dance of any type conducted in a premises where such exhibition, performance or dance involves a person who:
>
> > (1) is unclothed or such attire, costume or clothing as to expose to view any portion of the breast below the top of the areola or any portion of the pubic region, anus, buttocks, vulva or genitals; or
> >
> > (2) touches, caresses or fondles the breasts, buttocks, anus, genitals or pubic region of another person, or permits the touching, caressing or fondling of his/her own breasts, buttocks, anus, genitals or pubic region by another person, with the intent to sexually arouse or excite another person.

<u>Id.</u> § 5-2601(a).

"Adult entertainment premises" are "any premises to which the public, patrons or members are invited or admitted and wherein an entertainer provides adult entertainment to a member of the public, a patron, or a member."  <u>Id.</u> § 5-2601(b).  To obtain an "adult entertainment premises license," an applicant must submit personal biographical data, the names and biographical data of all business partners and corporate officers and directors, a description of the adult entertainment business

---

[13]   The licensing scheme is contained in CB-61 §§ 5-2602 - 5-2608, 5-2610 - 5-2611, 5-2614 - 5-2616.

history of the applicant, and a description of the employment of the applicant for the three previous years.[14]  Id. § 5-2605(a). Applicants for a premises license must also submit with their application proposed plans for security, traffic management and parking, a parking lot lighting plan, and a proposed life safety evaluation of the space in which the performance will be held, if the occupancy exceeds 250 persons.  Id. § 5-2606.

Managers and entertainers applying for a license must provide biographical information, as well as the name of any business where the applicant intends to work and proof that the applicant is at least eighteen years old.  Id. § 5-2605(b).

Within five days of receipt of a completed application, the Chief of Police "shall issue the applicable license," so long as the building in which the entertainment will occur has all required licenses, the applicants and all agents or employees have made no false statements, and all parties involved are at least eighteen years of age.  Id. § 5-2608.  Should the Chief deny an application, the aggrieved party may appeal the adverse decision to the Price George's County Board of Administrative Appeals, and then to the Circuit Court for Prince George's County, should the first appeal not succeed.  Id. §§ 5-2608, 5-2615 - 5-2616.

---

[14]  Biographical data includes an applicant's address, telephone number, and date and place of birth.  CB-61, § 5-2605(a)(1).  The applicant must also give addresses for the previous five years.  Id. § 5-2605(a)(4).  With regard to business history, the applicant must report the suspension or revocation of any other business licenses in the past.  Id. § 5-2605(a)(5).

Once a club is fully licensed and operational, the licenses of the owner, managers and entertainers must be posted in a place that is readily available for inspection.  Id. § 5-2610. Additionally, the manager is required to maintain a log of all entertainers and managers working at the club each day.  Id.  A licensed manager must be present at all times the club is in operation.  Id. § 5-2611.

The Chief of Police may close the club if there are violations of any part of CB-61.  The Police Chief's closure decision may be appealed in the same manner as a denial of a license.  Id. §§ 5-2614 - 5-2616.

a.   First Amendment Protection of Sexually
        Oriented Businesses

The First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech."  U.S. Const., Amend. I.  The Free Speech Clause of the First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  Gitlow v. New York, 268 U.S. 652, 666 (1925).  The First Amendment "bars the government from dictating what we see or read or speak or hear."  Ashcroft v. Free Speech Coalition, 535 U.S. 234, 245 (2002).  Expressive conduct is protected by the First Amendment, but it enjoys less protection than does pure speech and restrictions on its exercise are more likely to be constitutionally permissible. See e.g., United States v. O'Brien, 391 U.S. 367, 376 (1968).  Restrictions on expressive conduct are typically aimed at suppressing the secondary effects of the non-

20

expressive aspect of the conduct instead of the expression itself. <u>Steakhouse, Inc. v. City of Raleigh</u>, 166 F.3d 634 (4th Cir. 1999).

Sexual expression which is "indecent but not obscene is protected by the First Amendment." <u>Reno v. ACLU</u>, 521 U.S. 844, 874 (1997).  Nude dancing such as the type at issue here can be protected expressive conduct, but the Supreme Court has stated that "customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression." <u>Barnes v. Glen Theatre, Inc.</u>, 501 U.S. 560, 564 (1991).  As stated by Justice Stevens in <u>Young v. American Mini Theaters</u>, the First Amendment will not allow the total suppression of erotic expression, but "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate."  427 U.S. 50, 70 (1976).

Regulations enacted for the purpose of restraining speech due to the content of that speech presumptively violate the First Amendment. <u>Carey v. Brown</u>, 447 U.S. 455, 462-63, 463 n.7 (1980); <u>Police Dept. of Chicago v. Mosley</u>, 408 U.S. 92, 95 (1972).  If Prince George's County's purpose in enacting the statutes in question is "related to the content of the expression," then it must be justified under the "more demanding" strict scrutiny, which few statutes survive.  <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 289 (2000), <u>Texas v. Johnson</u>, 491 U.S. 397, 403 (1989).  However, "if the governmental purpose in exacting the regulation is unrelated to the suppression of expression, then the

21

regulation need only satisfy the 'less stringent'" intermediate

scrutiny.  Pap's A.M., 529 U.S. at 289, Johnson, 491 U.S. at 403.

It is well established that a government may place

restrictions on erotic expression if its goal is to prevent the

deleterious secondary effects of the adult entertainment

establishments, not suppress the erotic message.  City of Los

Angeles v. Alameda Books, Inc., 535 U.S. 425, 438 (2002) (stating

that it is a "settled position" that municipalities must be able

to address the secondary effects of protected speech); Boos v.

Barry, 485 U.S. 312, 320 (1988) (citing City of Renton v.

Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)); Giovani

Carandola, Ltd. v. Bason, 303 F.3d 507, 513 (4th Cir. 2002)

(hereinafter cited as "Bason"); Carandola II, No. 05-2308, slip.

op. at 11.  The Fourth Circuit stated in Bason:

> The Supreme Court has instructed that measures to
> regulate sexually explicit entertainment outside
> the home receive intermediate scrutiny if they are
> not premised on a desire to suppress the content of
> such entertainment, but rather to address the
> harmful secondary effects of such entertainment:
> higher crime rates and lower property values, and
> unwanted interactions between patrons and
> entertainers, such as public sexual conduct, sexual
> assault, and prostitution.

Bason, 303 F.3d at 513.


b.   Prior Restraint

A law "subjecting the exercise of First Amendment freedoms

to the prior restraint of a license, without narrow, objective,

and definite standards to guide the licensing authority, is

unconstitutional."  Shuttlesworth v. City of Birmingham, 394 U.S.

147, 150-51 (1969).   "[O]therwise valid content-neutral time,
place, and manner restrictions that require governmental
permission prior to engaging in protected speech must be analyzed
as prior restraints and are unconstitutional if they do not limit
the discretion of the decision maker and provide for the proper
procedural safeguards." 11126 Balt. Blvd., Inc. v. Prince
George's County, 59 F.3d 988, 995 (4th Cir. 1995).

Before CB-61 is analyzed under the O'Brien content-neutral
framework, the licensing scheme must be examined as a prior
restraint.   Id.; see id. at 997 (noting that the desire of Prince
George's County in enacting the licensing ordinance was to
"ameliorate the adverse secondary effects of adult bookstores"
but still employing the prior restraint analysis of Freedman v.
Maryland, 380 U.S. 51, 58-60 (1965).   If the licensing scheme
meets the Freedman requirements, it is not an unconstitutional
prior restraint.

Licensing restrictions on adult businesses will be upheld so
long as "(1) any restraint prior to judicial review can be
imposed only for a brief period during which the status quo must
be maintained; (2) expeditious judicial review of that decision
must be available; and (3) the censor must bear the burden of
going to court to suppress the speech and must bear the burden of
proof once in court." FW/PBS, Inc. v. Dallas, 493 U.S. 215, 227
(1990) (O'Connor, J.) (citing Freedman, 380 U.S. 58-60); Encore
Videos, Inc. v. City of San Antonio, 330 F.3d 288, 296-97 (5th
Cir. 2003).   The review procedure prior to issuance of the

license and judicial review of a denial must "cabin the decision-maker's discretion" so as to prevent the censorship of disfavored speech.  <u>Steakhouse</u>, 166 F.3d at 638.  Once the administrative review is completed, the second prong of <u>Freedman</u> requires an aggrieved applicant to have access to a prompt judicial <u>determination</u> of the merits of the claim.  <u>City of Littleton v. Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 781 (2004); <u>11126 Balt. Blvd.</u>, 59 F.3d at 999-1000.  However, the need for prompt judicial determination may be provided by an appeal of the adverse decision to the state's court system through the usual procedures.  <u>Z.J. Gifts</u>, 541 U.S. at 781-82.  Applying these standards, it is evident that the CB-61 licensing scheme is not an unconstitutional prior restraint.

The determination of the decision-maker[15] is sufficiently limited so as to cause no concern that the ordinance may give rise to arbitrary enforcement or censorship.  An application for an adult entertainment premises license requires only that the applicant provide biographical information and past business information germane to the present issuance of a license to do business.  CB-61, § 5-2605.  The requirement that an applicant submit parking and security plans and a life safety evaluation is not so nebulous as to render the discretion of the Chief of Police unlimited.  Furthermore, so long as the application is complete, the applicant will have a decision within five days.  <u>Id.</u> § 5-2608.

--------

[15]   Here, the Chief of Police.

Applicants for a manger's or entertainer's license need only submit proof of age, biographical data, and the list of locations at which the applicant intends to work.  Within five days of such an application, the applicant will have a decision.  While there always exists the possibility that some decision-maker might render arbitrary rulings based on whim and personal proclivities, the ordinance does not grant that power.  In order to stave off abuses, Prince George's County has provided an additional level of administrative review.

Should an application be denied or a license revoked, the adverse action must first be appealed to the Prince George's County Board of Administrative Appeals within ten days.  On November 1, 2006, just a few weeks after CB-61 was to take effect, the Board of Appeals adopted a rule requiring the Board to hear any appeals from license denials under CB-61 within twenty days of receipt of appeal.  After the argument is heard, the Board must, by its own rules, render a decision on manager or entertainer licenses within five days and on adult entertainment premises licenses within ten days.

Assuming an aggrieved applicant appeals as soon as possible, the administrative review will be completed thirty to thirty-five days after the initial application.  This review period is not so long as to render the licensing scheme unconstitutional.  Viewed in light of the Fourth Circuit's affirmation of the propriety of a ninety-day administrative review period in Steakhouse, the present review period certainly satisfies Freedman's first prong.

25

Addressing _Freedman's_ second prong, the judicial review period in CB-61 is directly analogous to that in _Z.J. Gifts_.  541 U.S. at 777.  There, the Colorado town of Littleton passed an ordinance requiring that adult bookstores and adult video stores apply for a license before doing business.  _Id._  A denial of a license could be appealed to the Colorado state courts pursuant to the state rules of civil procedure.  _Id._  Though the ordinance did not provide an accelerated briefing schedule or a time by which the decision had to be rendered, the Supreme Court held that the state's "ordinary judicial review procedures suffice as long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." _Id._ at 781-82.

CB-61 allows an appeal of the denial of a license to the Circuit Court for Prince George's County.  The appeal is governed by the state rules of procedure.  Just as in _Z.J. Gifts_, "ordinary court procedures [provide] judicial tools sufficient to avoid delay-related First Amendment harm."  _Id._ at 781. Additionally, this Court has every confidence that the Prince George's County Circuit Court judges will "execute [their] powers wisely so as to avoid" such serious threats of harm.  _Id._  In the highly unlikely case that the Circuit Court does not administer its procedures in a constitutional manner, Plaintiffs or other injured parties can mount a case-specific challenge.  _Id._ at 782.

26

3.   <u>Applying the O'Brien Test</u>

Plaintiffs allege that CB-61 is unconstitutional on its face because it includes conduct restrictions and a licensing scheme that blocks the free expression of their erotic dancing. Ordinances that "regulate sexually explicit entertainment outside the home receive intermediate scrutiny if they are not premised on a desire to suppress the content of such entertainment, but rather to address the harmful secondary effects of such entertainment: higher crime rates and lower property values." <u>Bason</u>, 303 F.3d at 513; <u>see also</u> <u>Alameda</u>, 535 U.S. at 434.

So long as it is conceivable that a jurisdiction sought to alleviate secondary effects of sexually oriented conduct, the Court will assume[16] that "<u>one purpose</u> of [the regulation] is to address the secondary effects that follow from lewd conduct on licensed premises, and that hostility to erotic expression, if a purpose of the restrictions at all, does not constitute the predominant purpose." <u>Id.</u> at 515 (emphasis added).

Supreme Court jurisprudence regarding the regulation of adult businesses based on their secondary effects has primarily focused on two types of regulations: public nudity ordinances and zoning ordinances.   <u>Carandola I</u>, 396 F. Supp. 2d at 636.

---

[16]   In <u>Bason</u>, North Carolina provided "no record evidence," "submitted no direct evidence of legislative motive," and did not "proffer a single study of secondary effects relied upon by the legislature or the Commission" to support their claim that they enacted the regulations to address secondary effects, "protect 'public decency' and to prevent 'disorderly conduct' and 'blatant bacchanalian revelries.'" 303 F.3d at 514.

Currently, the Renton test is used to examine zoning ordinances[17]
that affect sexually explicit businesses, and the O'Brien test is
employed to analyze public nudity statutes.[18]  Renton, 475 U.S.
at 46-50; Alameda, 535 U.S. at 433-34.  The Renton test asks:

> 1) if the law is a time, place and manner
> regulation, or a total ban,
>
> 2) if a time, place and manner regulation, what is
> the appropriate level of scrutiny, and
>
> 3) if intermediate scrutiny is appropriate, whether
> the law serves a substantial government interest
> and allows for reasonable channels of
> communication.

Renton, 475 U.S. at 46-50; Carandola I, 396 F. Supp. 2d at 636-
37.  The four-part O'Brien test examines whether:

> 1) the government has the constitutional power to
> enact the statute,
>
> 2) the statute furthers an important or substantial
> government interest,
>
> 3) the governmental interest is unrelated to
> suppressing free expression, and
>
> 4) the statute restricts First Amendment freedoms
> no greater than necessary to further the
> government's interest.

Barnes, 501 U.S. at 567 (citing O'Brien, 391 U.S. at 376-77);
Carandola I, 396 F. Supp. 2d at 637.

---

[17]It should be noted that Renton is used to analyze zoning
ordinances that target adult businesses, not generally applicable
zoning ordinances, such as CB-31. Renton, 475 U.S. at 46.

[18]As well as many other types of laws that affect speech.
See, e.g., O'Brien, 391 U.S. at 369; Turner Broad. Sys., Inc. v.
FCC, 520 U.S. 180, 185 (1997).

Though stated somewhat differently, the two tests are, in practical effect, nearly identical. <u>See</u> <u>Barnes</u>, 501 U.S. at 566 (stating that the <u>Renton</u> inquiry embodies the same standards as <u>O'Brien</u>); <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 798 (1989) (stating there is little, if any, difference between the two tests); <u>Ben's Bar, Inc. v. Vill. of Somerset</u>, 316 F.3d 702, 714 (7th Cir. 2003) (noting that the Supreme Court's most recent cases make it "abundantly clear that the analytical frameworks and standards utilized by the Court in evaluating adult entertainment regulations, be they zoning ordinances or public indecency statutes, are virtually indistinguishable"); <u>but see</u> <u>Peek-A-Boo Lounge of Bradenton v. Manatee County</u>, 337 F.3d 1251, 1264 (11th Cir. 2003) (concluding that despite the similarities in <u>O'Brien</u> and <u>Renton</u>, zoning and public nudity ordinances "must be distinguished and evaluated separately").

CB-61 is neither a zoning nor a pure public nudity ordinance, but the <u>O'Brien</u> test is used to analyze restrictions on exotic dancing such as those at issue here. <u>See</u> <u>Fantasy Ranch, Inc. v. City of Arlington</u>, 459 F.3d 546, 558 (5th Cir. 2006), <u>Carandola I</u>, 396 F. Supp. 2d at 637.

Though CB-61 has escaped strict scrutiny, the intermediate scrutiny of <u>O'Brien</u> is meaningful, and the County bears the burden of persuasion. <u>Bason</u>, 303 F.3d at 515. Prince George's County must produce evidence that the conduct restrictions and licensing provisions of CB-61 "materially advance an important or substantial interest by redressing past harms or preventing

29

future ones." <u>Satellite Broad. & Commc'ns Ass'n v. FCC</u>, 275 F.3d
337, 356 (4th Cir. 2001).  These harms "must be 'real, not merely
conjectural,' and the regulation must 'alleviate these harms in a
direct and material way.'" <u>Id.</u> (quoting <u>Turner Broad. Sys., Inc.</u>,
512 U.S. at 664).

To survive intermediate scrutiny, CB-61 must further the
County's substantial interest in regulating the secondary effects
associated with the adult entertainment that occur at the adult
entertainment clubs.  <u>O'Brien</u>, 391 U.S. at 376-77; <u>Barnes</u>, 501
U.S. at 567; <u>Renton</u>, 475 U.S. at 47.  Precisely how the County
must demonstrate this substantial interest and the amount of
evidence upon which the County may and must rely is articulated
in the burden-shifting framework of <u>Alameda Books, Inc. v. City
of Los Angeles</u>, 535 U.S. 425 (2002).

In <u>Alameda</u>, the City of Los Angeles enacted an ordinance
that prohibited adult businesses from being located within 1,000
feet of each other or within 50 feet of a religious institution,
school, or public park.  <u>Id.</u> at 430.  Writing for the plurality,
Justice O'Connor stated that the City of Los Angeles did not have
to "prove its theory about a concentration of adult operations
attracting crowds of customers." <u>Id.</u> at 437.  The plurality
reiterated the holding in <u>Renton</u> that "a municipality may rely on
any evidence that is 'reasonably believed to be relevant' for
demonstrating a connection between speech and a substantial,
independent government interest." <u>Id</u>. at 438; <u>Renton</u>, 475 U.S.
at 51-52.  However, this low bar does not grant the municipality

30

<u>carte</u> <u>blanche</u> to rely on "shoddy data or reasoning."  <u>Alameda</u>,
535 U.S. at 438.  The evidence relied upon by the municipality
"must fairly support [the] rationale for the ordinance."  <u>Id.</u>

Once the municipality has produced such evidence, plaintiffs
may then attempt to "cast <u>direct</u> <u>doubt</u> on this rationale, either
by demonstrating that the municipality's evidence does not
support its rationale or by furnishing evidence that disputes the
municipality's factual findings."  <u>Id.</u> at 438-39 (emphasis
added).  Put another way, plaintiffs can cast doubt on the
municipality's evidence either <u>intrinsically</u> - by undermining the
logical connection between the evidence and the ordinance - or
<u>extrinsically</u> - by presenting additional evidence that calls
validity of the municipality's evidence into question.

If the plaintiffs are unsuccessful in casting doubt on the
government's evidence of secondary effects, then the municipality
has carried its burden under <u>Renton</u> and <u>Alameda</u>, and the inquiry
is over.  <u>Id</u>. at 439.  However, if plaintiffs "succeed in casting
doubt on a municipality's rationale in either manner, the burden
shifts back to the municipality to supplement the record with
evidence renewing support for a theory that justifies its
ordinance."[19]  <u>Id.</u>

---

[19]  The plurality in <u>Alameda</u> held that the plaintiffs had
not cast doubt on the city's evidence, and thus the city carried
its burden.  <u>Id.</u>  However, it is important to note that the
<u>Alameda</u> reached the Supreme Court on appeal from the grant of
summary judgment, and the plaintiffs' only evidence consisted of
counsel's arguments that the city's main study failed to prove
that the city's justification was necessarily correct.  <u>Id.</u>

Although there is no majority opinion in <u>Alameda</u>, Justice Kennedy's concurrence is the narrowest opinion and thus has been recognized as controlling.  <u>See</u> <u>Peek-A-Boo Lounge</u>, 337 F.3d at 1264; <u>Ben's Bar, Inc.</u>, 316 F.3d at 722; <u>SOB, Inc. v. County of Benton</u>, 371 F.3d 856, 862 n.1 (8th Cir. 2003); <u>Carandola I</u>, 396 F. Supp. 2d at 638.  Justice Kennedy wrote separately to state that in addition to asking how much evidence is required to support the government's position, the proper inquiry asks "what proposition does a city need to advance in order to sustain a secondary-effects ordinance?"  <u>Alameda</u>, 535 U.S. at 449 (Kennedy, J., concurring in judgment).  In Justice Kennedy's view, whatever proposition the city advances must have "the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact."  <u>Id.</u>

The Court must therefore inquire "whether the municipality can demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance."  <u>Ben's Bar, Inc.</u> 316 F.3d at 724.  A municipality, then, may not justify the suppression of speech based on the bald assertion that the intent is to regulate secondary effects.  A connection must be made between the "negative effects and the regulated speech" through the evidence produced by the municipality and must survive the burden-shifting framework.  <u>R.V.S., L.L.C. v. City of Rockford</u>, 361 F.3d 402, 408 (7th Cir. 2004).  As noted by Justice Kennedy, "the necessary rationale for applying intermediate scrutiny is the promise that

32

zoning ordinances . . . may reduce costs of secondary effects without substantially reducing speech." <u>Alameda</u>, 535 U.S. at 450.

In specific reference to CB-61, the County must produce evidence that the conduct restrictions and licensing scheme will reduce the secondary effects it identifies, and must do so with evidence that it "reasonably believed to be relevant" and which "fairly supports" its rationale.  <u>Id.</u> at 438; <u>see</u> <u>id.</u> at 449. The rationale supported must be that limiting expression will have the "purpose and effect" of reducing the secondary effects identified by the County.

### a.   First Prong - Constitutional Power

The first prong of the O'Brien test requires that it be within the constitutional power of the Government entity to enact the regulation in question.  <u>Barnes</u>, 501 U.S. at 567.  It is undoubtedly within the power of the government to prevent public indecency and regulate, within constitutional limits, sexually oriented entertainment.  <u>Id.</u>  Moreover, Plaintiffs have not suggested that CB-61 fails in this respect.

### b.   Second Prong - Secondary Effects

### 1.   County Evidence Relied Upon

The "Declaration of Findings and Public Policy" that begins CB-61 states that the ordinance is intended to "mitigate the secondary effects of adult-oriented businesses."  CB-61, § 5-

2600(1).   Among those secondary effects, the ordinance notes, are
"(a) prostitution and other sex related offenses (b) drug use and
dealing and (c) health risks through the spread of AIDS and other
sexually transmitted diseases."   Id. § 5-2600(3).

At trial, Prince George's County introduced the evidence
that had been relied upon by the County Council.   This evidence
was of the type that Alameda and its progeny have recognized and
may validly be relied upon by municipalities.   See SOB, Inc., 317
F.3d at 862-63; Fantasy Ranch, 459 F.3d at 559.

The Council had before it copies of statutes regulating
adult entertainment businesses from other jurisdictions, as well
as anecdotal evidence of the deleterious effects of sexually
oriented businesses.   Def.'s Ex. 3.   The Council also had before
it various updates on legal precedent dealing with the regulation
of sexually oriented businesses, and summaries of crime impact
studies by municipal and state governments on the harmful
secondary effects of sexually oriented businesses.   The Council
also had evidence specific to the County, including a list of
calls for service and numbers of crimes at specific adult
entertainment clubs, as well as statements from Colonel Jeffrey
Cox of the County Police Department as to the problems that the
County faces in dealing with adult entertainment businesses.

The County introduced at trial thirty-three "studies" from
other jurisdictions on the effects of various types of sexually

34

oriented businesses.[20]  Def.'s Ex. 4.  Many of these "foreign
jurisdiction" studies have been relied upon by other
jurisdictions in prior cases.  <u>See</u> <u>Carandola I</u>, 396 F. Supp. 2d
at 643-45 (listing some of the studies relied upon by North
Carolina that were also relied upon by Prince George's County).

The evidence relied on by the County is typical of the
evidentiary support relied upon by other state and municipal
governments in enacting legislation similar to CB-61.  <u>Gammoh v.
City of La Habra</u>, 395 F.3d 1114, 1126 (9th Cir. 2005) (upholding
the reliance by a city on evidence very similar to that relied
upon by Prince George's County); <u>see also</u> <u>G. M. Enterprises, Inc.
v. Town of St. Joseph</u>, 350 F.3d 631, 633-34 (7th Cir. 2003);
<u>Fantasy Ranch,</u> 459 F.3d at 559; <u>Andy's Restaurant & Lounge, Inc.
v. City of Gary</u>, 466, F.3d 550, 555 (7th Cir. 2006); <u>N.W.
Enterprises, Inc. v. Houston</u>, 352 F.3d 162, 175-75 (5th Cir.
2003); <u>Encore Videos</u>, 330 F.3d at 294-96; <u>SOB, Inc.</u>, 317 F.3d at
862-63; <u>but see</u> <u>R.V.S., L.L.C.</u>, 361 F.3d at 411-12 (finding a
city's limited proffer of evidence insufficient to carry its
initial burden under <u>Alameda</u>).

The evidence introduced by the County was sufficient to
carry the initial burden under <u>Alameda</u> and <u>Renton</u>.  The burden
then shifted to Plaintiffs to offer evidence that rebuts the

---

[20]  Though termed "studies," Plaintiffs established that the
different materials cited as "studies" by Defendants varied
greatly in method and statistical significance.  The Court finds
the semantic question of what is a "study" to be insignificant
and thus will simply refer to anything termed as a "study" as
such.

Defendants' evidence either by demonstrating "that the
municipality's evidence does not support its rationale" or by
"disput[ing] the municipality's factual findings."  <u>Alameda</u>, 535
U.S. at 438-39.


### 2.   <u>Plaintiffs' Evidence</u>

Plaintiffs' primary witness was Randy D. Fisher, Ph.D., a
member of the faculty of the Psychology Department of the
University of Central Florida.  He holds a Ph.D. in psychology
from Vanderbilt University and was Director of the Survey
Research Laboratory from 1998 until 2003. He has authored over
500 peer-reviewed articles and has performed fifteen to twenty
reviews of the evidence put forth by municipalities for
restrictions on adult businesses.

Dr. Fisher prepared a report entitled "An Analysis of the
Predicate for CB-61-2006" critiquing the studies and evidence
relied upon by Prince George's County.  In performing his review
of CB-61, Dr. Fisher reviewed the evidence supplied by the
Plaintiffs to the County as well as the evidence submitted by
Defendants as the County's trial record.

It is sufficient for purposes of the instant discussion to
state that the Court finds that Dr. Fisher effectively
demonstrated that the "evidence" relied upon by the County was
manifestly inadequate to validate its secondary effects
conclusion with regard to the conduct restrictions.  Indeed, the
County appears to have gone out of its way to avoid obtaining

readily available information that could have been significant in
reaching a secondary effects conclusion with regard to conduct
restrictions.  For example, Wet Sands provides an all-male revue
in which nude dancers perform a few nights a week, but also
operates without adult entertainment on other nights, and even
allows a church to use the premises for services on certain days.
There is no doubt that anyone purporting to have a genuine
interest in secondary effects of adult entertainment should at
least compare the difference between "secondary effects" evidence
at this location on adult entertainment nights and the times when
there is other entertainment and/or church services.


### 3.   County's Trial Evidence

The County presented the testimony of Lewis Gentile
("Gentile"), author of the study of the effects of adult
businesses in Prince George's County on which the County relied
when enacting CB-61.  Gentile has had a long career in state and
federal law enforcement, holds a bachelor's degree in
criminology, a master's degree in public administration, and has
nearly completed his Ph.D. in sociology.  He is currently the
president of Gentile, Meinert and Associates, a consulting firm.

The Gentile study was seriously flawed and was inadequate to
support the County's secondary effects conclusion with regard to
the conduct restrictions in CB-61.  For example, Gentile
acknowledged that "[y]ou can't categorize what I've done as

37

meeting a statistics methodology, rigorous scientific requirements.  You would categorize it as a survey that has gone through a process."  Trial Tr. 10-11 (Dec. 20, 2006).   Moreover, Gentile conceded that some of the businesses in his study do not even provide adult entertainment.  Gentile also stated that he had no empirical evidence to support the claim that there was a secondary effect of an increase in crime.  His conclusion was supported "exclusively" by previous studies done by others, remote in place and time from the County of today.

Gentile testified that his conclusion that adult businesses cause a decrease in property values was based on "interviews with [some people] within relative close proximity"[21] and the "whole reasonableness of the issue."  Trial Tr. 11-12.  In sum, as Gentile himself testified, Dr. Fisher's critique of Gentile's report was "a fine piece of academic work."  Trial Tr. 23.

Of course, the County "need not conduct local studies or produce evidence independent of that already demonstrated by other municipalities to demonstrate the efficacy of its chosen remedy, 'so long as whatever evidence [the County] relies upon is reasonably believed to be relevant to the problem it addresses.'" Peek-A-Boo Lounge, 337 F.3d at 1265 (emphasis added).  However,

---

[21]   Gentile did not identify, and presumably did not know, where the interviewees lived or what connection, if any, they had to the vicinity of the business in question.  It appears that all that was known was that they happened to be in the vicintiy when interviewed.  Moreover, some of the businesses that Gentile studied were not even adult entertainment businesses.  The interview "evidence" is, accordingly, essentially without probative value.

deference to the County must be balanced with the Court's
"obligation to exercise independent judgment when First Amendment
rights are implicated." <u>Alameda</u>, 535 U.S. at 440 (citing <u>Turner
Broad. Sys., Inc.</u>, 512 U.S. at 666).  In accordance with that
balance, this Court must require the County's actions to be
narrowly tailored, such that the ordinance "be drawn to affect
only that category of business <u>shown to produce</u> the unwanted
secondary effects."  <u>Peek-A-Boo</u>, 337 F.3d at 1272 (citing <u>Renton</u>,
475 U.S. at 52) (emphasis added).


### 4.    The Conduct Restrictions

The County has not produced any credible evidence that the
conduct restrictions it seeks to impose on adult entertainment
businesses such as Plaintiffs' would reduce the alleged secondary
effects it sought to alleviate, such as drug dealing, the spread
of STDs, and an "atmosphere of deviance." <u>See</u> Trial Tr. 14.
Indeed, there is nothing of any substance to support a conclusion
that the secondary effects alleged by the County (such as rape,
robbery, assault, theft from automobiles, etc.) would be reduced
at all by requiring dancers to perform on an elevated stage,
keeping patrons six feet away from performers, prohibiting tips
during performances, banning any physical contact between patrons
and entertainers, etc.

Accordingly, absent the Savings Clause, the conduct
restrictions in CB-61 would not pass constitutional muster.  As
discussed above, however, the Savings Clause restricts the

applicability of the conduct restrictions to obscene conduct.
Such conduct is not afforded First Amendment protection.
Accordingly, by virtue of the Savings Clause, the conduct
restrictions in CB-61 are valid and enforceable, but, of course,
only with regard to conduct that is obscene under the <u>Miller</u>
standards.


## 5.   <u>The Licensing Scheme</u>

Plaintiffs were not successful in rebutting the evidence of
secondary effects supporting a licensing scheme.  The County
considered evidence establishing that, absent licensing, it is
not feasible to know of all adult entertainment clubs and
impossible to know the identities of operators, employees and
entertainers.  Many of the problems rendering Gentile's study
inadequate to support the County's conclusion regarding conduct
restrictions could be overcome if he (and the County) were able
to know which businesses provided adult entertainment.

The County has adequately demonstrated the secondary effects
caused by an absence of a licensing scheme.  These include the
County's inability to identify the pertinent businesses and
people, the need to ensure adequate security for patrons and
neighborhoods in view of the number of persons attending these
clubs at late hours, and the need to ensure that persons
convicted of certain offenses are not engaged in the business.
Additionally, it is apparent that imposing a licensing scheme
enabling the identification of entertainers and others who

generate substantial cash income is likely to have a positive effect upon the enforcement of the income tax laws.  Most importantly, Plaintiffs' demonstration of many of the defects in the County's evidence plainly indicates that a licensing scheme would substantially assist the County in an effort to obtain reasonably reliable evidence of the presence or absence of asserted secondary effects.

Thus, the Court concludes that the licensing scheme addresses a substantial interest in avoiding the reasonably perceived secondary effects stemming from the absence of a licensing scheme.

### 3.   Third Prong - Content Neutral

Under the third prong of the O'Brien, test, the ordinance must be "justified without reference to the content of the regulated expression." Barnes, 501 U.S. at 567.  As discussed above, the County's stated purpose in enacting CB-61 was to combat secondary effects of adult entertainment.  In view of that stated purpose, combined with the Fourth Circuit's assumption of that intent by the North Carolina legislature in Bason, the licensing scheme in CB-61 can be justified by the County's intent to regulate harmful secondary effects.  See Bason, 303 F.3d at 515 (presuming, though no evidence was offered on the point, that the North Carolina legislature intended to address the secondary effects of nude dancing).

d.    Fourth Prong - Unrelated to Suppression

Once a substantial interest is found that is unrelated to
the suppression of free speech, O'Brien requires that "any
incidental restriction on alleged First Amendment freedoms be no
greater than is essential to further the government's interest."
O'Brien, 391 U.S. at 376.  The County is not required to choose
the "least restrictive means" of serving the substantial
interest, but it may not "burden substantially more speech than
is necessary to further the government's legitimate interests."
Id.  The County may not "regulate expression in such a manner
that a substantial portion of the burden on speech does not serve
to advance its goals."  Id.

The Court concludes that the existence of a licensing scheme
in CB-61 is justified by the County's interest in preventing the
above-described secondary effects resulting from totally
unlicenced adult entertainment businesses of the type operated by
Plaintiffs.  The Court finds that except with regard to public
posting of licenses identifying licensed individuals, the
licensing scheme is no greater than is essential to justify the
County's legitimate governmental interest.

The ordinance provides that entertainers' licenses shall be
posted so as to be readily available for inspection by County
authorities (§ 5-2610) and managers' licenses "in a conspicuous
place and manner."  Id. at § 5-2610(b).  The ordinance is
ambiguous as to whether there must be a posting of licenses in a
manner that discloses the name and address of individual

42

licensees to members of the public.  The Court finds no justification for the posting of licenses in a manner to make public the names and/or addresses of individual licensees.

Thus, consistent with Judge Chasanow's preliminary injunction, the Court will enjoin enforcement of a requirement requiring the posting of licenses in a manner that would make the names and addresses of licensed individuals visible to members of the public.  On the other hand, the County might be able to adopt a public posting requirement that preserved the privacy of the names and addressees of individual licensees;[22] the posting provision could thus be adequately tailored to be valid and enforceable.  Or, there presumably could be a requirement that licenses need not be posted but had to be readily accessible for inspection by authorized governmental personnel.


III. <u>CONCLUSION</u>

For the foregoing reasons, the Court decides that:

    1.    Prince George's County Ordinance CB-31-2006 is facially valid and enforceable.

    2.    The provisions of Prince George's County Ordinance CB-61-2006, §§ 5-2609(a)(8), 5-2609(b)-(d) and 5-2613 are facially valid and enforceable.

    3.    The hours of operation provision in § 5-2612 is facially valid and enforceable to the extent that it imposes on adult entertainment businesses the

---

[22]    For example, it may be feasible to provide that there be public posting of licenses identifying individual licensees by an assigned number, with management required to have available for inspection by appropriate government personnel the identity and address of each such licensee.

same restrictions as applicable to businesses that
are licensed to serve alcoholic beverages.

4.    The sign posting provisions of Prince George's
      County Ordinance CB-61-2006, § 5-2609(a)(11) are
      facially valid and enforceable but only with
      regard to the display of a sign stating that the
      premises are licensed and that entertainers are
      not permitted to engage in any type of sexual
      conduct.

5.    The provisions of Prince George's County Ordinance
      CB-61-2006, §§ 5-2609(a)(1)-(7), and (a)(9)-(10)
      are facially valid and enforceable with respect to
      conduct that is "obscene" but not as to conduct
      that is not "obscene."

6.    The provisions of Prince George's County Ordinance
      CB-61-2006, §§ 5-2602 - 5-2608, 5-2611 and 5-2614
      - 5-2616 are facially valid and enforceable.

7.    The provisions of Prince George's County Ordinance
      CB-61-2006, § 5-2610 are facially valid and
      enforceable except as to the requirement for any
      public display of licenses disclosing the names
      and/or addresses of individual licensees.

8.    By separate Orders the Court shall issue Permanent
      Injunctions and Judgments consistent herewith.


      SO DECIDED, on Thursday, April 12, 2007.



                   _____/ s /_____
                     Marvin J. Garbis
                  United States District Judge

44